# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00429-CV

---

**YCUL, LLC and Earnest Taylor, Appellants**

**v.**

**Jennifer Peterson, Appellee**

---

### FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
### NO. 2021V-249, THE HONORABLE JEFF R. STEINHAUSER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

YCUL, LLC, and Earnest Taylor appeal from the trial court's judgment, rendered on a jury's verdict, declaring that a Texas General Warranty Deed (the Deed) purporting to convey real property in Fayette County to YCUL is void and that Peterson holds legal and equitable title to the real property. The judgment also awarded Peterson attorneys' fees. In four issues, YCUL and Taylor challenge the legal and factual sufficiency of the evidence supporting the jury's finding that the Deed did not convey the real property to YCUL due to Taylor's fraudulent conduct; assert that there was error in the jury charge; and challenge the trial court's attorneys' fee award. We will modify the judgment to condition the trial court's award of appellate attorneys' fees on an unsuccessful appeal to the supreme court and, as modified, affirm it.

## BACKGROUND[1]

In 2004, Peterson bought real property, including a house and garage apartment, located in La Grange, Texas (the Property). Peterson lived at the Property until 2019, when she moved to her mother's property to care for her due to her declining health. Peterson decided to sell the Property and asked a local real estate agent, Jeri Ann Taylor,[2] to look at the Property and provide her with a reasonable asking price. According to Peterson, Jerri Ann said the house could sell for $235,000. Peterson testified that she put a "For Sale" sign in the yard and that a person from Schulenberg expressed interest in buying the Property. Shortly after the sign went up, Taylor also contacted Peterson about purchasing the Property. Peterson testified that she had known Taylor since the two were five years old because Taylor's grandmother lived next door to the house Peterson grew up in. Peterson recounted that Taylor told her that he "always wanted that house," and that Taylor said he would be in La Grange that weekend and "we'll work something out." Peterson stated that she told Taylor that, because she had known him all her life, she would sell him the Property for $175,000. Peterson testified that she told Taylor that there was approximately $102,000 owed on the mortgage and that Taylor said he could "have this house paid off by April 16." Peterson stated that the April 16, 2019 date was important because it would be a "quick sale." Peterson testified that she called the bank holding the mortgage and got a payoff amount that she provided to Taylor in a phone call. Peterson agreed to meet Taylor on March 4, 2019, at the Silver Star, a bar in La Grange.

---

[1] The facts included in this section derive from the testimony presented and exhibits admitted at trial.

[2] Jerri Ann Taylor is not related to Earnest Taylor. We will refer to Earnest Taylor as Taylor and refer to others with the surname Taylor by their given names.

On March 4, 2019, Peterson, Taylor, Taylor's wife Leci, and Peterson's sister met at the Silver Star. Peterson stated that the Taylors brought with them a Texas Real Estate Commission (TREC) form residential resale contract that had been filled out to indicate that Peterson was the seller; YCUL was the buyer;[3] the sales price was $175,000; and the closing date was April 16, 2019. Peterson testified that she and Taylor agreed that the sale price for the Property was $175,000 and that Taylor was to pay off the mortgage's outstanding balance of $102,331.96 by April 16, 2019, and then pay her the difference between the $175,000 purchase price and the note payoff amount over the next five years.[4] Peterson stated that Leci wrote the additional payment term on the top of the TREC form contract. Peterson testified that after the meeting and discussion at the Silver Star, she, her sister, Taylor, and Leci went to Tommy Taylor's funeral home to have him notarize their signatures to the agreement.[5] Peterson testified that she believed the document she signed at the funeral home was the TREC form contract containing the terms she and Taylor had discussed. Peterson denied that the document she signed was a Deed and stated that the page of the document she signed did not have any words indicating that it was a Deed on the signature page. Peterson testified that Taylor must have "moved one sheet to the other sheet and made that deed later on." Peterson stated: "All I know is that when we went to Tommy Taylor's we were signing a contract; we were not signing a Deed."

---

[3] Taylor testified that he managed YCUL, which was a limited liability company owned by "multiple people," some of whose identities he "could not reveal," but included his son and daughter.

[4] Peterson stated that "Mr. Taylor would pay me the rest of the money, $12,000 a year for up to five years until they finished paying me the remaining of my money from the $175,000."

[5] There is no evidence in the record that Tommy Taylor is related to Earnest Taylor.

Peterson testified that, on March 4, 2019, Taylor gave her a check for $10,000 as a down payment on the Property that she credited toward the balance he would owe her on the $175,000 purchase price after paying off the mortgage. Peterson stated that Taylor agreed that he would "pay the bank off by April 16th and then he would continue to pay me off." Peterson testified that Taylor did not pay off the mortgage by April 16th and that when she called him that day and the next, he told her "don't worry, I've got this covered." In May 2019, Peterson received a $2,000 check from Taylor that she stated she was not able to cash when she presented it at Taylor's bank in Houston. Peterson explained that she went to Taylor's bank in Houston to cash the check and the bank teller said that there were insufficient funds to cash the check and also told Peterson "you're not the only one." Peterson testified that she received a $2,500 cashier's check from Taylor in December 2019. Peterson testified that she continued making mortgage payments on the Property through July 2020 to avoid foreclosure.

Peterson testified that in July 2019, she texted Taylor to tell him that she did not think he could "do his part" and that she was willing to return his money to him. In August 2019, she texted Taylor and told him she wanted to put the Property back on the market and asked him to call her. When he did not call her, Peterson continued to text him and finally, in June 2020, she texted him that "I've been calling you-all. The house is going up for sale." Peterson then asked Jerri Ann to list the house on July 21, 2020. Jerri Ann listed the house and put a sign in the yard that day. On July 23, 2020, Peterson was at the mailbox in front of the Property when Taylor and his wife came by. According to Peterson, Taylor told her "You don't have to worry about this property anymore. This property is in my name. I have the deed to it. You can go to the county clerk's office, and you can see. This house—this property is in my name." Peterson testified that she was shocked to hear this from Taylor. She stated, "I was just

4

shocked that Mr. Taylor had put the deed in his name knowing that he hadn't paid for it and that we grew up together." Peterson immediately went to the county clerk's office where she was told that there was a Deed on file transferring the Property to YCUL. Peterson then went to the district attorney's office where she was advised to contact an attorney. Peterson went to see an attorney who advised her to file a police report, which she did. Text messages between Peterson and Taylor were admitted as exhibits at trial. They showed that Peterson texted Taylor, telling him "legally you have to pay for the house [$]162,500" and accused him and Leci of trying to avoid paying her the purchase money they owed her. Taylor responded by text, telling Peterson that he "is not going to entertain her nonsense and monkey type business and we still friends." Peterson responded, "No, I just want my $62,500." Peterson testified that she also asked for a copy of the contract they discussed at the Silver Star in March 2019 because she had never been given a copy of that document. Peterson testified that after unsuccessfully trying to get Taylor to honor his agreement, she filed suit in September 2021, seeking a declaration that she had legal title to the Property.

Taylor testified that the dispute between him and Peterson started when he tried to buy the Property and that the heart of the dispute was whether he had purchased it from her. Taylor stated that he has purchased real estate as investments since 2018 but he did not intend to purchase the Property as an investment but, rather, to help Peterson out because she was struggling to keep up with the mortgage payments.[6] Taylor explained that he had known Peterson for fifty years and had heard from people that she was trying to sell the Property.

---

[6] In response to this testimony, Peterson stated that she earned approximately $80,000 a year working at the post office and that her husband makes $130,000 a year. Peterson stated, "I don't need anything from Mr. Taylor but what he owes me. [] I don't need nothing from him. All he needs to do was pay me."

Taylor stated that his agreement with Peterson was that he would pay her $10,000 and pay off the balance on the mortgage. Taylor denied that he also agreed to pay Peterson the difference between $175,000 and the balance on the mortgage and denied that they agreed that the difference would be paid off over five years at $12,000 per year. Taylor testified that the only reason he had not paid off the balance of the mortgage was because he did not know how much it was; that the only person who could provide a payoff amount was Peterson; and that Peterson failed to ever provide him with the payoff amount and "kept making excuses" for failing to do so.[7] When asked about the TREC form contract that Peterson stated he brought to the March 4, 2019 meeting, which included a $175,000 purchase price, Taylor stated that he never agreed to pay that amount for the Property and did not remember any TREC form contract being prepared or discussed. According to Taylor, he and Peterson never agreed to a purchase price for the Property; instead, they agreed that he was to pay her $10,000 and take over the note.

Taylor testified that, after meeting at the Silver Star, he, Leci, Peterson, and Peterson's sister went to the funeral home where they executed a Texas General Warranty Deed conveying the Property to YCUL. Taylor explained that he wanted an executed Deed before he undertook to pay off the outstanding balance on the mortgage, which he only failed to do because Peterson never gave him the payoff amount. When asked about the $2,000 check and the $2,500 cashier's check Taylor had given Peterson, which had the Property address written in the "memo" portion of the check, Taylor denied that those payments were in satisfaction of any obligation to pay Peterson for the Property but, rather, were made because "from time to time, I

_____

[7] Peterson testified that she obtained the payoff amount from the bank and provided it to Taylor over the phone before the March 4, 2019 meeting at the Silver Star. Taylor testified that he did not know if the payoff amount was accurate and that he didn't want to pay that amount and risk either underpaying or overpaying the bank.

would try to help her as much as I could; and that's what this money was for." Specifically, Taylor stated that Peterson told him she needed money to connect a water line to her son's home and that he was trying to help her take care of her son.[8]

Taylor stated that he did not record the Deed in March 2019 because he was waiting for Peterson to provide him with the payoff amount, which he testified he could not obtain from the bank. Taylor testified that he waited to record the Deed because he trusted Peterson to "do the right thing" and provide him with the payoff amount and because he "looked at her as family" and this was not "your average deal." Taylor stated that he recorded the Deed on July 13, 2020, because Peterson "kept putting me off" even though "she told me she was going to give me a payoff amount," and that he thought "hey, its time for me to record the Deed." Taylor denied that he had recorded the Deed after learning in June 2020 that Peterson was planning to put the Property back on the market. Taylor testified that he could have paid off the note at any time despite agreeing that YCUL did not have the cash available. Taylor stated that he could have refinanced another property YCUL owned to get cash to pay off the balance due the bank on the Property. Taylor testified that he, through his wife's company DCRS, had made some payments to the bank and that he would not have done so if he did not believe that he already owned the Property.[9] Taylor testified that the Deed, which he contends was executed by

---

[8] In response to this testimony, Peterson explained that her son's water line had already been installed but that, because she and Taylor often talked about their children and families, she hoped he would be more likely to make the payments he owed her if she told him she needed money to help her son.

[9] In response to this testimony, Peterson stated that the money paid to the bank was not coming from Taylor or YCUL but, rather, was derived from rent Taylor was collecting from or on behalf of a nephew who was living at the Property.

Peterson on March 4, 2016, at Tommy's funeral home, conveyed title to the Property to him as of that date.

Tommy testified that Taylor, Leci, Peterson, and Peterson's sister came to his funeral home on March 4, 2019, and asked him to notarize their signatures. Tommy stated that because he had known Taylor and Peterson for close to 50 years, he did not ask to see their driver's licenses. Tommy explained that when he notarizes a signature, he asks the signatory to write their name and driver's license number in his notary book. Then he usually writes a description of the type of document that is being notarized in the description section of his notary book and that he gets the description he uses "from the top of the document" being notarized. Tommy identified several such entries in his notary book including a "Quitclaim Deed," an "Affidavit," a "Warranty Deed," and a "Will and Testament." Tommy testified that the description he entered in his notary book of the document Taylor and Peterson were signing that day was "Contract," and stated that he did that because he was told by Taylor and Peterson that the document they were signing that day was a "contract." He also stated, however, that he did not review the document himself. Tommy testified that he believed that if he had notarized signatures to a Deed, he would have put "Deed" in the description in his notary book but also stated that he did not know whether the document Taylor and Peterson signed in his presence was or was not a Deed.

After the parties rested, the court sent the jury to deliberate the following question:

Did the Deed convey the Property to YCUL, LLC?

Usually, a failure of consideration is not ground for the avoidance of an executed deed. However, a deed may be void and fail to convey title if the

8

lack of consideration is accompanied by fraud.

Fraud occurs when –

1. a party makes a false promise to do an act, and

2. the promise is material, and

3. the promise is made with the intention of not fulfilling it, and

4. the promise is made to a person for the purpose of inducing that person to enter into a contract, and

5. that person relies on the promise in entering into that contract.

The Defendants in this case have also plead affirmative defenses which you, as the jury, may take into consideration when deliberating on the questions below. An "*affirmative defense*" is when a defendant asserts facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.

The following have been asserted by the Defendants in this case for the jury's consideration:

a. Equitable Estoppel. Equitable estoppel is the effect of the voluntary conduct of a party, whereby he is precluded, both in law and in equity, from asserting the rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who, on his part, acquires some corresponding right either of property, of contract, or of remedy.

b. Quasi-Estoppel. Quasi-estoppel, strictly speaking, is an equitable doctrine that precludes a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. It precludes a party from asserting, to another's detriment, a right inconsistent with a position she has previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position with one in which she accepted a benefit. Quasi-estoppel requires mutuality of parties.

c. Estoppel-by-Deed. Estoppel by deed stands for the proposition that all parties to a deed are bound by the recitals in it, which operate as an estoppel. Estoppel-by-deed does not bind mere strangers. Recitals in a deed are evidence against the parties to such deed and their privies, but not against strangers. Estoppel-by-deed turns not on intent but simply on the recitals in the deed, which operate as an estoppel.

9

Answer "Yes" or "No."

Answer:_____

The jury answered this question "No," thus determining that the Deed failed to convey the Property to YCUL either because it, standing alone, did not operate to convey the Property to Taylor or because of a failure of consideration coupled with Taylor's fraud.[10]

YCUL and Taylor filed a motion to set aside the jury's verdict, arguing that there was conflicting evidence as to whether Peterson executed the Deed—specifically Peterson's testimony that she did not sign the Deed but, rather a contract for sale of the Property and Taylor's testimony that he saw her sign the Deed in front of a notary and two witnesses. But, relying on expert testimony offered at trial that the signature at issue was Peterson's original signature,[11] conveyance of the Property by the Deed was "all but established as a matter of law." YCUL and Taylor also argued that "no evidence of fraud was submitted to the jury beyond a scintilla." YCUL and Taylor asserted that, as a matter of law, they were entitled to "a JNOV as to the issue of conveyance and title of the property being duly transferred" to them. The trial court denied the motion.

Peterson filed a motion for attorneys' fees, supported by the affidavit of her attorney and accompanying invoices, requesting that the court include in its judgment an award

---

[10] The jury's answer suggests that the jury either believed Peterson when she testified that she did not sign the Deed and that it must have been created by Taylor unilaterally combining the pages of the Deed with the signature page to the document she signed at the funeral home, or because the jury found that Taylor's conduct constituted fraud which, along with failure of consideration, rendered the Deed void and caused the Deed to fail to convey title.

[11] Peterson did not dispute at trial that her signature was on the document but, rather, whether the document she signed at the funeral home was the Deed or a contract.

of attorneys' fees in the amount it determined appropriate. The attorney's affidavit stated that Peterson had incurred $67,359.96 in attorneys' fees.

The trial court rendered a final judgment on the jury's verdict, declaring that the Deed was void and did not convey title to the Property and that Peterson "continues to hold legal and equitable title to" the Property. The court awarded Peterson $50,000 in attorneys' fees and further ordered that she was entitled to "$15,000 as attorney's fees in the event of an appeal to the Texas Court of Appeals" and "$10,000 as attorney's fees in the event of submission of briefs to the Supreme Court of Texas." YCUL and Taylor filed a motion for new trial, which was overruled by operation of law, and then perfected this appeal.

## DISCUSSION

### *Jury Charge*

In their third issue, which we address first, YCUL and Taylor assert that the trial court's charge was error because, in their view, it improperly asked the jury to decide a question of law. Specifically, they complain that the jury was asked "to construe the legal effect of the Deed." As an initial matter, YCUL and Taylor did not make this complaint about the charge by making a proper objection at the charge conference. *See* Tex. R. Civ. P. 274 (party objecting to charge must point out distinctly objectionable matter and grounds of objection and any complaint as to defect in jury question is waived unless specifically included in objection). The parties must make all objections to the charge before the court reads the charge to the jury. *Id.* R. 272; *King Fisher Marine Servs. v. Tamez*, 443 S.W.3d 838, 843 (Tex. 2014). A party's objection to the charge must be timely and specific. *Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014); *Thota v. Young*, 366 S.W.3d 678, 689 (Tex. 2012). The objection must clearly identify the error

11

and explain the grounds for the complaint. Tex. R. Civ. P. 274; *Burbage*, 447 S.W.3d at 256. If the objection does not meet both of these requirements, it will not preserve error. *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex. 1986). A specific objection enables the trial court to understand the precise grounds, make an informed ruling, and remedy any defect. *Burbage*, 447 S.W.3d at 256; *McKinney v. National Union Fire Ins.*, 772 S.W.2d 72, 74 (Tex. 1989); *Castleberry*, 721 S.W.2d at 276.

At the formal charge conference,[12] YCUL and Taylor's counsel stated that he had "both omissions and additions" to the charge. First, counsel stated that the additions to the charge he requested were that the affirmative defenses in Question 1 be "posed as questions to the jury, not so much as instruction" so that the jury would "actually consider" each affirmative defense, "weigh" them, and "eventually vote on it." Counsel expressed concern that otherwise the jury would disregard the affirmative defense, "not give it the weight it needs," or "misunderstand the exact question at hand." This does not constitute an objection that Question 1 of the charge erroneously asks the jury to make a legal conclusion.

Concerning the referenced "omissions," counsel stated:

> Now, in regards to the omissions—I'm sorry—the defendants object to the charge as is. I guess omission is because, one, the way the charge is drafted right now, it neglects to consider defendants' counterclaim on common law fraud. The—I believe even though the jury charge may consider the trial amendments and the issue of title, it fails to consider our counterclaim; and, so, I believe that would be prejudicial to our case. And at the same time, the jury charge also on Question 1 has an ambiguity that I feel may cause issue when it comes to—refer it of attorneys fees.

---

[12] The record reflects that counsel and the court met for an hour and a half the previous day and an hour that morning to discuss and work on the charge. The court stated that it "wanted to note for the record how much time had been spent on that."

> Now, granted on promissory estoppel, the plaintiffs have the ability to recover fees; but in Question 1, whether one interprets that as a title dispute or whether one—whether one interprets that as a case of fraud or questions of fraud or statute of fraud remains to be seen but I believe it is misleading the way it's outlined and I would—I would object to this Question 1's wording, as well.

Counsel's objection to Question 1 was not that it "allowed the jury to construe the legal effect of the Deed," but rather, that it contained some unidentified ambiguity that might cause some unidentified issue regarding attorneys' fees. This objection did not raise the complaint that YCUL and Taylor advance on appeal.

In their motion for new trial, YCUL and Taylor asserted that the jury's finding should be set aside because it was not supported by legally sufficient evidence. Specifically, YCUL and Taylor argued that "it was error for the jury to decide on the legal sufficiency of a scrivener's error" and that "[i]n the trial, several legal errors were made all centering on one critical issue: Did the scrivener's error on the deed properly convey title? The legally correct answer is 'Yes,' and for that reason, a new trial should be granted and judgment rendered as a matter of law." Although YCUL and Taylor stated in their motion for new trial that it is improper to ask the jury to "decide the legal effect of an instrument," the question submitted to the jury did not simply ask the jury to confirm the legal effect of the Deed and thereby constitute an immaterial question that could be disregarded by the court of appeals. *See Spencer v. Eagle Stars Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (question of law may be deemed immaterial when it calls for finding beyond province of jury). Rather, the question was submitted with an instruction that fraud accompanied by failure of consideration causes a deed to be void and fail to convey title, set out the elements of fraud, and thereby presented the jury with the question of whether there was evidence that Taylor's conduct met the elements of fraud

13

such that the conduct, along with failure of consideration, prevented the Deed from effectively conveying title to YCUL. The scope of the jury question was not limited to confirming the legal effect of a deed generally or answering a question of law. Therefore, the jury question was not immaterial such that the trial court, or this Court, could disregard it. We overrule the third issue.

## Legal and Factual Sufficiency of the Evidence Supporting the Jury's Finding

In their first and second issues, YCUL and Taylor challenge the legal and factual sufficiency of the evidence supporting the jury's finding that, due to fraud, the Deed did not convey the Property to YCUL.[13] The jury was instructed that "a deed may be void and fail to convey title if the lack of consideration is accompanied by fraud" and the charge defined the elements of fraud as: (1) a false promise made by one party, (2) that is material, (3) that is made with the intention of not fulfilling it, (4) that is made for the purpose of inducing a person to enter into a contract, and (5) the person relies on the promise in entering into that contract. We must consider the sufficiency of the evidence supporting each of these elements.

When a party attacks the legal sufficiency of an adverse finding on which he did not have the burden of proof, he must demonstrate on appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We review the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 821-22, 827 (Tex. 2005); *see also Graham Cent. Station*, 442 S.W.3d at 263. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the factfinder must

---

[13] Taylor and YCUL also argue that the evidence is legally insufficient to support a trespass-to-try-title claim or a suit to quiet title. Neither of these theories was submitted to the jury and the judgment is not based on either theory. Therefore, we do not address the arguments related to these theories.

14

be allowed to do so, and we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 SW.3d at 822.

When a party attacks the factual sufficiency of the evidence of a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Commission for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). "If we determine that the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the challenged finding; we need not do so when we affirm." *Bennett*, 489 S.W.3d at 66.

We apply these standards mindful that this Court is not a factfinder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact is the sole judge of witness credibility and the weight afforded their testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16; *see City of Keller*, 168 S.W.3d at 819-20. Therefore, we may not pass on the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *GTE Mobilnet*, 61 S.W.3d at 615-16.

When an issue of material fact is submitted to the jury, the sufficiency of the evidence is measured by the questions and instructions in the charge. *See Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex. 2010) (noting that evidentiary sufficiency is measured against jury charge); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) (observing that court is bound to review evidence in light of instruction submitted to jury without objection); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (stating that when submitted without objection, court's charge, not some other unidentified law, measures sufficiency of evidence); *see also Secure Comm, Inc. v. Anderson*, 31 S.W.3d 428, 430-31 (Tex. App.—Austin 2000, no pet.) (holding that appellant waives right to complain of ruling to which no error was assigned). In this case, the jury was asked whether "the Deed conveyed the Property to YCUL, LLC" and was instructed that a deed "may be void and fail to convey title" if lack of consideration is accompanied by fraud. The jury was further instructed that fraud occurs when (1) a party makes a false promise to do act; (2) the promise is material; (3) the promise is made with the intention not to fulfill the promise; (4) the promise is made for the purpose of inducing the person to enter into the contract; and (5) that person relies on the promise when entering in to the contract. Thus, we consider whether there was factually and legally sufficient evidence to support a jury finding that the Deed failed to convey the Property to YCUL because Taylor's actions met the elements of fraud set forth in the jury charge's instruction.

Reviewing the evidence in the light most favorable to the appealed finding, we conclude that there is some evidence of each of the elements of fraud as instructed to the jury. First, there is evidence that Taylor promised to pay off the balance of the mortgage due on the Property by April 16, 2019, and also to pay Peterson the difference between an agreed-upon

16

purchase price of $175,000 and the mortgage balance. There was evidence that Taylor made these promises to induce Peterson to convey the Property to him or to YCUL. There was evidence that, when the promises were made, neither Taylor nor YCUL had the financial ability to perform the promised mortgage payoff. There was no evidence that either Taylor or YCUL took any steps to either sell or refinance other assets or otherwise try to obtain the funds required to pay off the mortgage. Instead, the evidence at trial was that Taylor did not even attempt to make the promised payoff, insisting instead that he could not do so because Peterson never provided him with the payoff amount and that she was the only person who could get that information from the bank. Peterson, however, testified that she obtained the payoff amount of $102,331.96 from the bank before meeting Taylor at the Silver Star, that she informed him of the payoff amount, and that amount was written in a loan addendum document that was prepared as part of the parties' negotiations. Taylor testified that he never promised to pay Peterson the difference between the note payoff amount as part of the purchase price, and the undisputed evidence at trial was that he did not make any such payment. Reviewing this evidence in the light most favorable to the jury's finding and indulging every reasonable inference that supports it, we conclude that this evidence would enable a reasonable and fair-minded person to conclude that Taylor did not intend to make this payment to Peterson. *See Graham Cent. Station*, 442 S.W.3d at 263; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (slight circumstantial evidence of fraud when considered with breach of promise to perform sufficient to support finding of fraudulent intent).

There was evidence that Taylor's payment promises to Peterson were both material and relied on by her in entering the agreement to sell the Property to Taylor or YCUL, his company. Peterson testified that she was informed by a real estate professional that the

Property could sell for $235,000 but agreed to the lower $175,000 purchase price because the promised April 16, 2019 date for paying off the mortgage meant a "quick sale" and because Taylor was a longtime family friend. Peterson testified that she was not in any financial distress that would warrant her transferring the Property to Taylor without payment to avoid making future mortgage payments. Peterson testified that she continually pressed Taylor to pay her the additional funds he promised to pay her for the Property as well as to honor his commitment to pay off the mortgage.

We conclude that the evidence is legally sufficient to support the jury's finding that Taylor's fraud caused any Deed signed by Peterson to "be void and fail to convey the title" to the Property, a finding they made in accordance with the jury charge and instructions. Having reviewed all the evidence, much, but not all of which, we have previously described in this opinion, we determine that the evidence supporting the jury's finding is not so weak as to make the finding clearly wrong and manifestly unjust. Thus, we also conclude that the evidence is factually sufficient to support the jury's finding. We overrule Taylor and YCUL's first and second issues.

### *Attorneys' Fees*

In their fourth issue, Taylor and YCUL assert that the trial court erred in awarding Peterson attorneys' fees because attorneys' fee awards are not available in a trespass-to-try-title suit or in a suit to quiet title to remove a cloud on title. In this case, however, Peterson asserted a cause of action for statutory fraud and requested attorneys' fees pursuant to Tex. Bus. & Com. Code Ann. § 27.01 (West). *See* Tex. Bus. & Com. Code § 27.01(e) (providing that person who commits fraud in transaction involving real estate shall be liable to person defrauded for

reasonable and necessary attorneys' fees). The elements of fraud set forth in the jury instruction are those comprising the statutory definition of fraud in section 27.01(a). *See id.* § 27.01(a) (setting forth elements of statutory fraud supporting award of attorneys' fees). The jury found each of the elements included in the statutory definition; the trial court rendered judgment on the jury's verdict; and, consequently, the trial court's award of attorneys' fees was authorized by the statute.

Taylor and YCUL also complain that the trial court's judgment fails to make the award of appellate attorneys' fees contingent on Peterson's success on appeal. *See Sky View at Las Palmas LLC v. Mendez*, 555 S.W.3d 101, 116 (Tex. 2018) ("A party should not be penalized for pursuing a meritorious appeal.") (citing *Hoefker v. Elgohary*, 248 S.W.3d 326, 332 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that award of attorneys' fees must be conditioned on appellant's unsuccessful appeal)). We agree that the trial court's failure to condition the award of appellate attorneys' fees to Peterson on an unsuccessful appeal by Taylor and YCUL was error. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ) (award of attorneys' fees on appeal must be conditioned on receiving party's success). The proper remedy for an unconditional award of appellate attorneys' fees is to modify the judgment and to make the award contingent on the receiving party's success on appeal. *See R & R Res. Corp. v. Echelon Oil & Gas, L.L.C.*, No. 03-07-00636-CV, 2010 WL 5575919, at *13 (Tex. App.—Austin Jan. 14, 2011, pet. denied) (mem. op.) (citing *Hoefker*, 248 S.W.3d at 332-33). The error is harmless with respect to the award of fees for an appeal to this Court because Taylor and YCUL have been unsuccessful in their appeal. *See id.* (holding error harmless when appellant's appeal to court of appeals was unsuccessful). We therefore modify the trial court's award of attorneys' fees for an appeal to the

supreme court by Taylor and YCUL to be conditioned on the appeal being unsuccessful. *See Hoefker*, 248 S.W.3d at 332-33.

## CONCLUSION

For the reasons stated in this opinion, we modify the trial court's judgment to condition the award of appellate attorneys' fees for an appeal to the supreme court on that appeal being unsuccessful. As modified, we affirm the trial court's judgment.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Modified and, as Modified, Affirmed

Filed: September 16, 2025